## UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In re:                                       )    Chapter 11
                                             )
J.S. II, L.L.C., *et al.*,                   )    Case No. 07-03856
                                             )    (Jointly Administered)
            Debtors.                         )
                                             )    Hon. Jacqueline P. Cox

### MEMORANDUM OPINION ON MOTIONS OF DEBTORS
### AND KINSELLA AND DIAMOND TO DISMISS (Docket Nos. 509 & 510)
### THIRD-PARTY COMPLAINT FOR EQUITABLE SUBORDINATION

On November 1, 2007, the debtors, consisting of J.S. II, L.L.C. ("JS II"); River Village I,

L.L.C. ("River Village"); and River Village West, L.L.C. ("River Village West") (collectively

referred to herein as the "Debtors")[1], filed their objection to the claim of Thomas A. Snitzer and

Snitzer Family L.L.C. ("SFLLC") (collectively, "Snitzer") and filed a three-count counterclaim for

breach of fiduciary duty, breach of contract, and equitable subordination of any Snitzer interests. In

response, on December 14, 2007, Snitzer filed an Answer to the counterclaim and a third-party

complaint against John Kinsella, Sid Diamond, Kinsella Investments L.P., and Diamond Family,

L.L.C. (collectively referred to herein as "Kinsella and Diamond") seeking equitable subordination

of their interests. The Debtors and Kinsella and Diamond, each move to dismiss Snitzer's third-party

complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (made applicable by Federal Rule

of Bankruptcy Procedure 7012). Kinsella and Diamond also move to dismiss Snitzer's third-party

complaint under Federal Rule of Civil Procedure 14(a) (made applicable by Federal Rule of

Bankruptcy Procedure 7014). For the following reasons, both motions to dismiss Snitzer's third-

party complaint pursuant to Fed.R.Civ.P. 12(b)(6) are denied; the motion of Kinsella and Diamond

---

[1]An additional Debtor LLC, KND Investments, LLC, did not join the motions to dismiss.

to dismiss Snitzer's third-party complaint pursuant to Fed.R.Civ.P. 14(a) is granted.

## I. Jurisdiction

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (C), and (O).

## II. Background

The Debtors are a group of Illinois limited liability companies established to develop Bridgeport Village, a residential real estate project along the Chicago River in the Bridgeport neighborhood of Chicago, Illinois.  The role of JS II in the project was to act as the owner of the project as well as nearby parcels of land held for future development.  River Village was set up to develop Bridgeport Village, while River Village West acted as the rental agent for the parcels held by JS II for future development.  Snitzer and SFLLC, of which Snitzer is the managing member, own a 50% interest in each of the Debtor companies.  However, the Debtors dispute that SFLLC has any membership interest in JS II.  Until he was removed by order of a Cook County, Illinois Chancery Court in June 2005, Snitzer also acted as the Debtors' manager and agent.  Kinsella and Diamond are members and principals of JS II and have membership interests in River Village and River Village West.

The Bridgeport Village development project was the first phase in a multi-phase residential real estate development project with a goal of developing over 400 residences on approximately thirty-one acres of property.  Phase I of the project, Bridgeport Village, consisted of 115 single-family homes on eleven acres of land.  Bridgeport Village was the only phase of the development project completed before the project went awry, leaving approximately twenty acres of undeveloped

2

commercially zoned land that has not yet been rezoned for residential use.

The development project became inundated with serious problems. In May 2005, a dispute between Snitzer and both Kinsella and Diamond arose regarding Snitzer's management of the Debtors. Snitzer filed suit in the Circuit Court of Cook County seeking an injunction against Kinsella and Diamond to bar them from interfering with his management of the project. In response, Kinsella and Diamond filed a counterclaim seeking removal of Snitzer as manager and agent of the Debtors. In June 2005, the circuit court ruled for Kinsella and Diamond and removed Snitzer from management of the project, finding that Snitzer's conduct placed the integrity of the project in jeopardy. Kinsella and Diamond were subsequently appointed by the circuit court to take over management of the project. Snitzer kept his membership interests in the Debtors. Unfortunately, the Debtors could not overcome the project's problems and filed for relief under chapter 11 of the bankruptcy code on March 5, 2007. The Debtors, along with Kinsella and Diamond, blame Snitzer for the project's downfall. On the other hand, Snitzer argues that commingling, undercapitalization and mismanagement of the Debtors by Kinsella and Diamond after Snitzer's removal as manager and agent of the Debtors precipitated the bankruptcy.

A. *Allegations Against Snitzer*

The Debtors allege that gross misconduct and breach of fiduciary duty by Snitzer caused the project to go bankrupt. First, the Debtors argue that Snitzer, as manager, violated several City of Chicago ordinances regarding building code, permit, and customary construction requirements. These violations concern approximately ninety homes built during Snitzer's tenure as manager. During construction of these homes, the Debtors allege that Snitzer visited the construction site only once or twice a week for a few hours at a time. They also complain that Snitzer constructed the

homes without registering as a general contractor or using a properly licensed general contractor. It is also alleged that Snitzer failed to hire an architect or engineer to oversee construction of the project, and that many of the homes were built without providing contractors and subcontractors architectural drawings, detailed plans, and specifications. Also at issue is whether Snitzer changed many plans and specifications on the homes causing them to significantly differ from the plans submitted to obtain the building permits, resulting in several building code violations. The violations include homes built with lateral load shear walls that differed from the plans, homes that exceed height restrictions, porches built with combustible materials too close to adjacent structures, homes with third floors that exceed maximum square footage allowed under fire safety regulations, third floors without a required secondary means of egress, homes built lacking proper fire insulation, homes with unpermitted basements, garages with unpermitted roof-top decks, homes that encroach on properties owned by neighboring landowners, and homes that violate setback requirements of the City of Chicago. In sum, the Debtors assert that the City of Chicago found multiple violations in each of the ninety homes built, sold and occupied under Snitzer's stewardship. The Debtors also state that Snitzer is responsible for various punch-list repair items made on homes to remedy various defects. According to the Debtors, the total cost to remedy the violations and the punch-list items exceeds $3 million.

The Debtors also allege that Snitzer concealed building code violations and obstructed enforcement by the City of Chicago. This may have begun in 2003 when a disgruntled subcontractor began a public crusade challenging the project's construction practices. Snitzer is alleged to have represented to the other members of the Debtors, as well as the project's lender and the City of Chicago, that no material problems existed and that the homes were constructed according to the

4

plans submitted to the City of Chicago. In an attempt to rebut the claims of the disgruntled subcontractor, Snitzer hired an architect to inspect the plans submitted to the City of Chicago. At issue is whether the architect ever physically visited the homes and whether Snitzer told the architect that the homes differed significantly from the plans. Did the architect improperly opine that the plans complied with the requirements of the City of Chicago?

Did Snitzer obstruct the City's enforcement efforts regarding the violations? Seventy-eight stop work orders were issued against the project between May 2002 and November 2004, mostly for work done contrary to permits issued by the City. The problems crescendoed on November 5, 2004 after the City inspected the homes and issued a stop work order on the entire project. As a result of the number of violations found, Stanley Kaderbeck, head of the City's Building Department and a structural engineer, became personally involved in the project to resolve the construction issues. Snitzer met with Kaderbeck, promising to resolve the violations. Based upon Snitzer's promises, the City allowed construction to resume on the project. At issue is whether Snitzer failed to remedy the violations and, after repeated requests, failed to meet with Kaderbeck again. In January 2005, the City again inspected homes in Bridgeport Village and shut down the entire project. As a result of the shut down, the project's lender called in its loan.

The Debtors also allege other conduct on Snitzer's behalf amounting to recklessness, negligence and breaches of fiduciary duty. They allege poor accounting practices by Snitzer. Snitzer, although not an accountant, kept the project's books and records on a personal computer at his home. Did Snitzer have an independent accountant audit the project's books? Additionally, the Debtors allege that Snitzer used Debtors' assets for personal purposes. First, the Debtors allege Snitzer used Debtors' assets and a subcontractor working on the Bridgeport Village project to

5

construct an addition to the home of Snitzer's brother-in-law. Snitzer was involved in actions in the Circuit Court of Cook County concerning Dearborn Park, a real estate development project in which the Debtors have no interest. Allegedly Snitzer directed the Debtors' attorney to represent him personally in the suits. At issue is whether Snitzer used $24,000 of the Debtors' funds for litigation expenses in connection with these cases.

The Debtors also allege additional breaches of fiduciary duty against Snitzer regarding an insider deal with a former long-time associate of Snitzer's named Michael Kennedy. Snitzer hired Kennedy to supervise construction work for the project. However, Kennedy was not licensed by the City of Chicago as a contractor. Additionally, in September 2001, Snitzer executed a contract with Banyan Distribution and Building Supplies, Inc. ("Banyan"), a company owned by Kennedy. The contract granted Banyan the exclusive right to provide all windows, millwork, hardware, and cabinetry to 414 homes of the project and designated Snitzer and Kennedy as the only persons authorized to act on the Debtors' behalf in regards to the contract.[2] Under the Debtors' operating agreement, according to Kinsella and Diamond, this type of contract required the consent of the non-managing members as well. According to the Debtors, none of the other members were aware of the contract. After its execution, both Snitzer and Kennedy began ordering materials under the contract well in advance of when the materials were needed, contrary to the customary business practice of just-in-time delivery of supplies practiced by the Debtors.[3] The materials were then

---

[2]At the time the contract was executed, only Phase I of the project had commenced. Phase I consisted of only 115 homes.

[3]Just-in-time delivery involves ordering supplies so they arrive as needed for a particular project. This avoids storage costs and allows the warranty to transfer to the homeowners rather than allow the warranty to expire while the supplies sit in storage.

6

deposited into a warehouse where they remained until they were needed. Subsequent design changes may have rendered these materials obsolete requiring the Debtors to purchase replacement materials. Additionally, warranties on many of the supplies began to run when they were shipped to the warehouse. By the time the materials were used, the warranties expired before sales on the residences closed. This made the subsequent homeowners look to the Debtors to remedy defects that should have been covered under the manufacturer's warranty.

The Debtors also allege that Snitzer violated his fiduciary duty to the Debtors by establishing an unauthorized deferred compensation agreement between River West and Kennedy, along with two other associates. These agreements may have required the vote of the non-managing members. Allegedly Kinsella and Diamond were not aware of this agreement. In May 2005, when Snitzer was involved in the litigation with Kinsella and Diamond in the circuit court, did Snitzer direct the custodian of the deferred compensation account to liquidate it? On the day Snitzer was removed from the Bridgeport Project, did the custodian wire funds from the account, totaling $395,000, to an account belonging to Kennedy? Did Snitzer transfer this money without seeking authority to do so from either Kinsella or Diamond or the circuit court?

The Debtors allege Snitzer committed them to another insider deal. It is alleged that without obtaining authorization from the other members as was required by the operating agreement, Snitzer gave Arthur Hershkowitz, a long-time associate of Snitzer's, an open-ended listing contract to sell industrial properties in Bridgeport Village. Did Snitzer then conceal this agreement from Kinsella and Diamond, even though Snitzer was involved in selecting a different agent to market the property? Hershkowitz has since filed a claim for $1 million against the Debtors for the agreement he made with Snitzer.

7

## B. *Allegations Against Kinsella and Diamond*

Snitzer disputes much of the Debtors' allegations and blames Kinsella and Diamond for the project's downfall, stating that the project and the Debtors became bankrupt due to the actions of Kinsella and Diamond after Snitzer was removed as manager and agent for the Debtor companies.

According to Snitzer, the project was highly successful under his management. Supporting this, Snitzer states that the average selling price of a home in Bridgeport Village more than doubled between 2002 and early 2005, increasing from $469,000 to $963,000 and that approximately $16 million of debt was reduced to approximately $1 million, allowing Snitzer to return capital contributions of $2.5 million each to Kinsella and Diamond. Snitzer also points to several awards the project received while he was manager.[4] He also points to several parcels of real estate that he caused River Village West, through JS II, to acquire at favorable terms for future development. Included in these properties were the "Iron Street Property," "Holsum Property," and the "Gray Property." Snitzer contends that the project fell apart and entered bankruptcy protection due to mismanagement by Kinsella and Diamond after Snitzer was removed as manager.

According to Snitzer, he operated the Debtor companies as separate and distinct entities, following the formalities required by the Illinois Limited Liability Company Act and Illinois law generally.[5] Snitzer maintains that there was never any improper commingling of funds and assets while he controlled the accounting of the Debtors. Also, Snitzer alleges in detail the separate roles anticipated for each Debtor company. River Village was set up to function as the operating entity

---

[4]These awards were: Best City of Chicago Project, Chicago Association of Homebuilders (2002, 2003, and 2004); Best City Development, *Chicago Sun Times* (2003); Best City Development, *New Homes Magazine* (2003).

[5]The Illinois Limited Liability Company Act is 805 ILL. COMP. STAT. §§ 180/1-1, *et al.*

for the development and sale of the homes in Phase I. River Village West was formed to act as the operating entity for the acquisition and management of several industrial rental properties. JS II was formed in connection with a prior development, Dearborn Village, that was managed by Dearborn Village, LLC. Snitzer, Kinsella, and Diamond each had membership interests in Dearborn Village, LLC, either individually or through entities they controlled. Snitzer contends that JS II was a "nominee for the benefit of Dearborn Village," holding legal title to Dearborn Village property. Were the Debtors' assets, liabilities, profits, and losses filed on the tax returns for Dearborn Village, not JS II? In connection with River Village and River Village West, JS II was allegedly also a nominee[6], holding title to properties owned by River Village and River Village West, with both those LLCs being the real parties in interest. According to Snitzer, Kinsella and Diamond were completely aware of this structure, as well as of the day-to-day management of the project by Snitzer.

After Snitzer was removed as manager of the Debtors in 2005, did Kinsella and Diamond disregard the formalities that Snitzer claims that he observed while managing the companies? Specifically, Snitzer contends that Kinsella and Diamond improperly used funds from one LLC to pay for the expenditures and liabilities of another. If so, was this done without seeking a majority vote of the members of each affected LLC?

Snitzer also states that undercapitalization led to the project's downfall. Under the River Village operating agreement, Kinsella and Diamond, and their related entities, were to contribute "an amount not to exceed [$8.5 million]." However, Snitzer states that the most they ever contributed was $2.5 million each, which Snitzer later returned when the project was more prosperous and its chances of success were brighter. According to Snitzer, any money Kinsella and Diamond

---

[6]The Debtors contend "alter-ego" is a more apt term.

contributed thereafter has been classified as loans, even though the operating agreement for River Village requires at least $8.5 million in capital contributions before future contributions could be classified as loans. In order to disregard this requirement, did Kinsella and Diamond need to obtain Snitzer's vote to classify these cash flows as loans? Snitzer claims he was never approached regarding classifying contributions as loans. According to Snitzer, had the project been properly funded through the required capital contributions, the project would not have descended into bankruptcy.

Snitzer also complains of additional mismanagement by Kinsella and Diamond. First, Snitzer notes that when the project was shutdown in 2005, there was an inventory of homes valued at approximately $6 million and that they could have been sold to bring money into the project, which could have avoided the subsequent financial problems. Second, Snitzer questions hiring and firing decisions Kinsella and Diamond made, particularly the hiring and subsequent termination of a new construction superintendent in 2006. To replace the construction superintendent, Kinsella and Diamond hired FCL Construction, who Snitzer contends is experienced primarily in commercial construction, not residential. Snitzer states that the fees for FCL Construction were three to four times higher than the previous superintendent's fees or any superintendent that Snitzer had hired. Third, Snitzer states Kinsella and Diamond made unreasonably excessive payments to subcontractors for work and materials. Fourth, Snitzer complains that Kinsella and Diamond spent too much money repairing warranty and punch-list items on completed homes. Fifth, Snitzer disagrees with the installation of the structural gates. The gates were required by the City of Chicago to remedy building code violations. Snitzer believes the Debtors should contest the gates requirement or seek reimbursement from the design professionals who were responsible for designing the homes with

10

the defect that now requires installation of the gates. Finally, Snitzer blames Kinsella and Diamond for the lagging sales of homes in the project since he was removed as manager and agent in June 2005.

Snitzer filed a third-party complaint in response to the Debtors' counterclaim seeking equitable subordination of the interests of Kinsella and Diamond under § 510(c) of the Bankruptcy Code. Both the Debtors and Kinsella and Diamond subsequently filed motions to dismiss.[7] The Debtors argue that Snitzer's claims are derivative claims belonging to the estate depriving Snitzer of standing to pursue such claims and that since Snitzer lacks standing, he is violating the automatic stay by pursuing the claims. The Debtors also argue that Snitzer's claims that relate to post-petition management of the Debtors by Kinsella and Diamond violate the *Barton* doctrine. There is also a *res judicata* issue because Snitzer raised similar capitalization allegations at a prior hearing. This Court overruled these objections in authorizing the sale of property. Kinsella and Diamond adopt the Debtors' arguments but add a procedural objection to the third-party complaint as improper under Fed.R.Civ.P. 14(a), made applicable by Fed.R.Bankr.P. 7014.

### III. Discussion

A Motion to Dismiss under Fed.R.Civ.P. 12(b)(6), made applicable by Fed.R.Bankr.P. 7012, tests the sufficiency of the complaint, not the merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). Well-pleaded allegations contained in the complaint are regarded as true and are to be read in a light most favorable to the plaintiff. *United Independent Flight Officers v. United*

---

[7]Kinsella and Diamond are jointly represented by Tabet, DiVito & Rothstein, LLC ("TDR"). TDR was counsel for Kinsella and Diamond before the bankruptcy and was authorized by this Court on May 30, 2007 to continue to pursue claims against Snitzer in state court. Kinsella and Diamond are suing Snitzer therein on the Debtors' behalf.

11

*Air Lines,* 756 F.2d 1262, 1264 (7th Cir. 1985). If the complaint contains allegations of evidence from which a trier of fact may reasonably infer necessary elements of proof that will be addressed at trial, dismissal is improper. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 421 (7th Cir. 1994).

## A. *Snitzer's Standing to Assert a Claim for Equitable Subordination Pursuant to 11 U.S.C. § 510(c)*[8]

The Debtors first attack Snitzer's third-party complaint arguing that he lacks standing to bring such a claim. According to the Debtors, Snitzer's allegations of commingling, undercapitalization, and mismanagement are derivative claims of the estate that may be brought only by them, acting as debtors-in-possession and that any attempt by Snitzer to bring these claims violates the automatic stay imposed when the case was initially filed. Consequently, the Debtors seek sanctions against Snitzer for violating the automatic stay.

Creditors generally have no standing to bring derivative claims such as undercapitalization or breach of fiduciary duty against directors, principals, or officers of a debtor corporation without prior court approval as these claims belong to the debtor. *See Chrysler Rail Transp. Corp. v. Indiana Hi-Rail Corp.,* 1996 WL 238788 at *3 (N.D. Ill. 1996) (dismissing claim by creditor seeking

---

[8]Section 510(c) states:

> Not withstanding subsections (a) and (b) of this section, after notice and a hearing, the court may-
>
>> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>>
>> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

damages for undercapitalization of debtor corporation as claim properly belonged to the trustee); *see also Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1346 (7th Cir. 1987), *cert. denied*, 485 U.S. 906 (1988) (recognizing that claims against officers, directors, and shareholders are claims of the bankruptcy estate).  However, the Seventh Circuit has held that creditors have direct standing to pursue an equitable subordination claim under § 510. *Matter of Vitreous Steel Products Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990); *In re SRJ Enterprises, Inc.*, 151 B.R. 189, 196-97 (Bankr. N.D. Ill. 1993).  As *Vitreous Steel* stated:

> Equitable subordination is not a benefit to all unsecured creditors equally, at least where the creditor whose claim is objected to is at least partially unsecured; it is a detriment to the creditor whose debt is subordinated.  Thus, when a party seeks equitable subordination, it is not acting in the interests of all the unsecured creditors.  While the Trustee [or debtor-in-possession] may find that it is in the best interests of the estate to seek equitable subordination, individual creditors have an interest in subordination *separate and apart* from the interests of the estate as a whole.  The individual creditor should have an opportunity to pursue its separate interest.

*Vitreous Steel*, 911 F.2d at 1231 (emphasis added).

To equitably subordinate a claim under § 510, the three-prong balancing test first enunciated in *Matter of Mobile Steel Co.*, 563 F.2d 692, 700 is utilized. *Vitreous Steel*, 911 F.2d at 1237.  When applying the test, the court must consider whether "(1) the claimant creditor has engaged in some sort of inequitable misconduct; (2) the misconduct has resulted in injury to the other creditors or in unfair advantage to the miscreant; and (3) subordination of the debt is consistent with other provisions of the bankruptcy code." *Id.*  This inquiry must be applied on a case-by-case basis focused on fairness to the other creditors with the court considering all relevant circumstances in deciding whether to subordinate a claim. *Id.*

In his third-party complaint, Snitzer alleges that Kinsella and Diamond engaged in inequitable conduct by disregarding corporate formalities with regard to the Debtor LLCs,

13

undercapitalization by failing to capitalize the project as required under the operating agreements of the LLCs, and gross mismanagement, citing several examples. Taken as true for the purposes of this motion under Fed.R.Civ.P. 12(b)(6), these allegations support a finding that the first prong of the *Mobile Steel* test, that the creditor has engaged in equitable misconduct, has been satisfied. Snitzer further alleges that this inequitable conduct led to the Debtors' descent into bankruptcy, thereby injuring Snitzer as a member of the Debtor LLCs, satisfying the second prong of the test that the alleged misconduct results in injury to the other creditors. Further, if Snitzer succeeds in asserting his subordination claim, it would be consistent with the Code's general good faith requirements, meeting the third prong. He would be placed ahead of Kinsella and Diamond when distributions, if any, are made as a matter of fairness. Since Snitzer has standing to pursue a claim for equitable subordination under § 510 of the bankruptcy code as indicated in *Vitreous Steel* and has pled an adequate claim, the motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for lack of standing is denied.

Since Snitzer has standing to bring his claim for equitable subordination, he has not violated the automatic stay in seeking this relief. As such, sanctions against Snitzer are inappropriate and will not be granted.

## B. The Barton *Doctrine*

The Debtors next argue that Snitzer's third-party complaint violates the *Barton* doctrine by bringing an action against Kinsella and Diamond for acts related to their post-petition management of the Debtors. To support this contention, the Debtors point to paragraphs 41-45, 67, 72, 78, and 87(f)-(I) of Snitzer's third-party complaint. These paragraphs state:

> 41. Since taking over management from Snitzer in June 2005, Kinsella and Diamond have not been observing corporate formalities and have improperly commingled (and have stated

14

that they intend to continue commingling) funds and assets of the separate LLCs.

42.  In particular, Kinsella and Diamond have used revenues from River Village West's industrial properties to pay for expenditures of River Village to perform work on Bridgeport Village Phase I.

43.  Additionally, Kinsella and Diamond used the equity from River [Village] West's industrial properties as collateral for loans whose proceeds were used to pay for expenditures of River Village to perform work on Bridgeport Village Phase I.

44.  Kinsella and Diamond also started using JS II as an operating company and have purported to have that company assume liabilities of River Village, without the consent of Snitzer.

45.  Additionally, Kinsella and Diamond are proposing that the Court approve a substantive consolidation of the Debtors, pursuant to which proceeds of the sale of River Village West's (or, in their view, JS II's) industrial properties would generate cash to pay for or reimburse expenditures on Bridgeport Village for the benefit of River Village.
[...]
67.  Despite River Village's requirement for capital to complete Bridgeport Village from 2005 to the present, Kinsella and Diamond have repeatedly refused to restore their previous capital contributions or to make additional capital contributions. Instead, upon information and belief, they have made what they characterize as "loans," in an aggregate amount that is substantially less than their prior capital contributions.
[...]
72.  If Kinsella and Diamond had contributed capital to River Village pursuant to their obligations to do so, they could have avoided placing the Debtors into bankruptcy, which would have avoided the expenditure of several million dollars in administrative expenses, as well as the recent sale of the "Iron Street Property" at a distressed, as-zoned price of $12.50 per square foot.
[...]
78.  Based on their own repeated declarations of financial crisis and statements to the Bankruptcy Court of a need for cash for the operations of Bridgeport Village, Kinsella and Diamond have admitted that River Village "requires additional capital contributions" and that such capital is "reasonably necessary to meet the expenses and obligations of the Company."
[...]
87.  Based on the incomplete disclosures and discovery he has received to date, Snitzer is informed and believes that Kinsella and Diamond made several serious and material management errors that have diminished the profitability of River Village. Full discovery and an accounting are required to determine the scope and extent of their errors and their impact. He [Snitzer] presently believes that the errors include, without limitation, the following:
[...]
        f.  Spending unnecessarily large sums on "warranty" or "punch list" work. Based on Snitzer's experience as a developer, the sums reported by Kinsella and Diamond may reflect that they have agreed to repair certain alleged problems in sold homes that were out

15

of warranty or that were maintenance issues rather than construction defects for which River Village was responsible and/or they grossly overpaid for legitimate punch list or warranty work. Discovery is required to determine what these funds were spent on and whether such expenditures were proper. Alternatively, Kinsella and Diamond should be seeking reimbursement from the design professionals, contractors or material suppliers (and their insurers) who were responsible for the alleged problem.

g. Agreeing, upon information and belief, to the costly installation of "structural gates" to remedy an alleged structural issue raised by the City of Chicago. Kinsella and Diamond should either have contested the gates requirement as unreasonable (since the City is imposing the requirement at Bridgeport Village but not on approximately thirty thousand other similarly constructed homes in the City, and the City has admitted that the alleged structural problem poses no life or safety issues), or, alternatively, should be seeking reimbursement from the design professionals (and their insurers) who were responsible for the structural condition giving rise to the alleged problem.

h. Kinsella and Diamond were grossly negligent with respect to the very slow pace with which River Village completed and sold homes after June 2005. Under Snitzer's management, River Village completed and sold homes at a much more rapid rate. Kinsella and Diamond's very slow progress, combined with the excessive expenditures to complete and build homes, unnecessarily exacerbated the liquidity problems of River Village.

I. Kinsella and Diamond were grossly negligent with respect to their failure for over two years to sell undeveloped lots at Bridgeport Village to generate revenue for River Village.

By bringing these claims, the Debtors contend that Snitzer violated the *Barton* doctrine and should face sanctions for doing so.

The *Barton* doctrine, first announced by the Supreme Court in *Barton v. Barbour*, provides that a trustee of a bankruptcy estate is a statutory successor to the equity receiver and that a receiver cannot be sued without leave of the court appointing him. *Barton v. Barbour*, 104 U.S. 126, 128-29 (1881). Since the bankruptcy court appoints the trustee that administers property of the estate that is under the control of the bankruptcy court pursuant to the bankruptcy code, the trustee is essentially an agent of the court. *Matter of Linton*, 136 F.3d 544, 545 (7th Cir. 1998). Therefore, under the *Barton* doctrine, leave from the appointing court is required before filing suit against a trustee for acts done within the trustee's administrative capacity. *Id.* Further, the *Barton* doctrine bars suits

16

against the trustee in the appointing court as well as a foreign forum, such as a state court. *In re marchFIRST, Inc.*, 378 B.R. 563, 566-67 (Bankr. N.D. Ill. 2007) (Schwartz, J.). A debtor-in-possession enjoys the same rights and protections as a bankruptcy trustee. 11 U.S.C. § 1107(a); *Precision Industries v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003). Without prior court approval for suits against a trustee (or a debtor-in-possession, as in this case), a trustee would face the burden of defending the suit and the threat of distraction, raising the concern that it would be more difficult to appoint a trustee because the appointment would be less appealing or more costly. *See marchFIRST*, 378 B.R. at 567 (addressing these same concerns that were raised in *Linton*).

Snitzer makes three arguments disputing the Debtors' contention that the *Barton* doctrine has been violated. First, he argues that *marchFIRST* was wrongly decided and urges that the *Barton* doctrine only applies to suits in a foreign forum, not a suit brought in the appointing court. Second, Snitzer distinguishes *Linton* since equitable subordination, and not damages against the trustee (or debtor-in-possession), is being sought in this case. Finally, he argues that the *Barton* doctrine does not apply in this case because he is seeking relief from Kinsella and Diamond for pre-petition acts.

In his first argument against application of the *Barton* doctrine, Snitzer contends *marchFIRST* ignored the "concern with the integrity of the bankruptcy jurisdiction" that a suit against a trustee in another forum would threaten, as stated in *Linton*. *Linton*, 136 F.3d at 546. He asserts that there would be no threat to the "integrity of the bankruptcy jurisdiction" by allowing his claim because the appointing court would be deciding the matter. Snitzer further urges that the holding in *marchFIRST* is *dicta*, since the case was actually decided on a statute of limitations issue and is therefore not binding on this Court. However, the policy concerns recognized by both *Linton* and

17

*marchFIRST* against allowing suits against a trustee without prior court approval are involved here. Even a suit against a trustee in the appointing court subjects a trustee to the burden of defending a suit (or multiple suits) at a cost to a trustee and to the estate. This could affect effective administration of a bankruptcy estate. Therefore, this Court respectfully declines to disregard *marchFIRST*.

The remedy distinction Snitzer argues carries some weight. Whether facing a suit for damages or equitable subordination, the same burdens would exist for a trustee in defending the suit, except that equitable subordination targets other creditors, not the trustee. The Debtors have not been sued in the third-party complaint. They have not been named as defendants therein and no relief as to them is sought there.

Snitzer's strongest argument is that the *Barton* doctrine is inapplicable because the events underlying the undercapitalization claims occurred pre-petition and not during the administration of the bankruptcy estate. Therefore, the *Barton* doctrine would be inapplicable for events occurring during that time. Snitzer would be barred, however, from asserting claims against Kinsella and Diamond for acts occurring after March 5, 2007 without prior approval of this Court. The issue of potential sanctions for a *Barton* doctrine violation is premature. The *Barton* doctrine does not defeat Snitzer's equitable subordination claim.

C. *Res Judicata* and Collateral Estoppel

The Debtors next argue that Snitzer's claims regarding undercapitalization are barred under the doctrine of *res judicata*. Under *res judicata*, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *SECA Leasing Ltd. Partnership v. Nat'l Canada Finance Corp.*, 159 B.R. 522, 523

(Bankr. N.D. Ill. 1993) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 393, 398 (1981)).

Three essential elements must be satisfied in order for *res judicata* to apply. *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 907 (7th Cir. 1990). These elements are "1) a final judgment on the merits in an earlier action; 2) an identity of the cause of action in both the earlier and later suit; and 3) an identity of parties or privies in the two suits." *Id.* A bankruptcy sale order is considered a final judgment on the merits for purposes of *res judicata*. *Matter of Met-L-Wood Corp.*, 861 F.2d 1012, 1016 (7th Cir. 1988). In the Seventh Circuit, identity of a cause of action is determined under the "same transaction" test. *Alexander v. Chicago Park Dist.*, 773 F.2d 850, 854 (7th Cir.. 1985), *cert. denied*, 475 U.S. 1095 (1986). Under this test, identity of a cause of action consists of a "single core of operative facts which give rise to a remedy." *Id.*

The Debtors argue Snitzer's undercapitalization allegations were decided when this Court entered an order approving the sale of the "Iron Street" property on December 10, 2007. The sale was precipitated by the fact that a $5 million payment was due to a secured lender in early 2008. Snitzer objected to the sale, specifically the amount of funds the sale would bring into the estate. The objection centered on Snitzer's assertion that the failure of Kinsella and Diamond to contribute capital as provided by the River Village operating agreement required the Debtors to sell the property as zoned for a much lower price than it would sell for if it was rezoned as was planned for the project. Had the capital contributions been made, Snitzer argues, the estate would not have been forced to sell the property in what Snitzer characterized as a fire sale. Snitzer argues that the lender could be paid from the required $8.5 million contribution from Kinsella and Diamond instead of selling the "Iron Street" property as zoned, at a lower value. Snitzer's objections were overruled in the December 10, 2007 sale order.

Snitzer argues that *res judicata* is inapplicable in this case for several reasons. First, Snitzer argues *Precision Industries* bars the application of *res judicata* in cases where the issue is before the court that issued the sale order in the same bankruptcy proceeding. Snitzer notes that the cases cited by the Debtors involved cases of an attack on the sale order itself. Snitzer distinguishes the present case by noting that he is seeking equitable subordination based on failure to contribute capital and is not attacking the sale order. Snitzer's reliance on *Precision Industries* is mistaken. In *Precision Industries*, the plaintiff leased a warehouse from the defendant. *Precision Industries*, 327 F.3d at 540. The defendant lessor filed for chapter 11 bankruptcy during the term of the lease. *Id.* As part of the bankruptcy, the defendant obtained a sale order authorizing the sale of the warehouse to another company affiliated with the debtor free and clear of any interests pursuant to

11 U.S.C. § 363(f). *Id.* at 540-41. Although present at the sale hearing, the plaintiff lessee did not raise any objections to the sale itself. *Id.* After the sale order was entered, the plaintiff lessee vacated the warehouse well before the lease term expired. *Id.* at 541. The defendant lessor then changed the locks and sealed off access from the plaintiff lessee who subsequently tried to reenter the property. *Id.* The plaintiff lessee filed suit in a district court alleging, *inter alia*, wrongful eviction and breach of contract. *Id.* The defendant lessor argued that § 363(f) extinguished any rights or interests the plaintiff had in the property. *Id.* Conversely, the plaintiff argued that § 363(f) did not apply; instead § 365(h) applied. *Id.* The language in § 365(h) indicates that a sale of real property pursuant to § 363 did not eliminate a lessee's possessory interest in property subject to a sale order, thus setting up a confrontation between the two subsections. *Id.* Both the plaintiff and defendant requested that the district court remand the matter back to the bankruptcy court in order to clarify the order by determining which provision prevailed. *Id.* On remand, the bankruptcy court

20

held, *inter alia*, that the sale order eliminated any possessory interest the plaintiff had in the property, including the remaining term of its lease. *Id.* Further, the bankruptcy court held that the plaintiff was barred by *res judicata* from further proceeding in the action since the plaintiff had an opportunity to object to the sale but failed to do so. *Id.* 541-42. On appeal, the Seventh Circuit held *res judicata* did not apply since both parties asked the bankruptcy court to clarify a previous order and the bankruptcy judge rendered a decision on the merits that the sale order eliminated the plaintiff's possessory interest. *Id.* at 543. Basically, *Precision Industries* dealt with a dispute regarding property interests *resulting* from the sale order, not issues attacking the sale order itself. Therefore, Snitzer's broad reading of *Precision Industries* that *res judicata* is inapplicable when the issue is heard before the same judge who issued the sale order is not persuasive.

Snitzer also argues that *res judicata* does not apply because the claims raised in the third-party complaint and the objection to the sale of the "Iron Street" property are different. Although he acknowledges that both claims assert a common fact in that both involve the failure to contribute capital by Kinsella and Diamond pursuant to the River Village operating agreement, there are additional facts rendering *res judicata* inapplicable. In the "Iron Street" property objection, Snitzer maintains that his argument was that the capital contribution requirement under the operating agreement was triggered when the loan payment became due and was a better financial alternative than selling property as zoned in 2007. Snitzer now argues in his third-party complaint that undercapitalization led to financial problems resulting from the failure of Kinsella and Diamond to contribute necessary capital after they were appointed as managers in 2005. Under Snitzer's argument, both claims are based on different evidence and facts, mainly that the objection to the sale of the "Iron Street" property involved financial issues in late 2007; the third-party complaint relates

21

to the financial condition of the project in 2005 and 2006.

Applying the elements for *res judicata* in this case, the first and third elements are not in issue. Snitzer concedes that the December 10, 2007 sale order of the "Iron Street" property was a final decision on the merits. The parties do not dispute that the parties involved in the objection to the sale of the "Iron Street" property are the parties currently before the Court in the third-party action.[9] At issue is whether Snitzer's third-party complaint, as it alleges undercapitalization by Kinsella and Diamond, is based upon the same core of operating facts involved in the "Iron Street" property sale objection.

In this case, Snitzer's argument, that the undercapitalization issues raised in the "Iron Street" property sale are different than the undercapitalization issues in the present motion, is persuasive. The applicable argument in Snitzer's objection to the sale of the "Iron Street" property was:

> *Rather* than engage in a fire sale, Messrs. Kinsella and Diamond *should* honor their contractual obligation to contribute capital. Under the River Village I LLC Operating Agreement, Messrs. Kinsella and Diamond are obligated to contribute up to $8.5 million in capital when the LLC "requires" it... *If they were to* honor their capital contribution obligation, they *could* contribute either the $5 million needed for the DIP financing pay-down in January, or the amount needed for increased monthly payments, which would be paid back upon a resale subject to zoning.

(Snitzer's Objections to Proposed Sale of Commercial Properties, and Motion to Compel Debtors to Make Full Disclosure Regarding Sale of Debtors' Commercial Real Estate and to Enlarge Scope of Rule 2004 Examinations, attached as Ex. B to Third-Party Defendants Kinsella and Diamond's Motion to Dismiss Snitzer's Third-Party Complaint, pgs. 14-15) [Dkt. 510] (emphasis added).

---

[9]There may be an issue as to whether Kinsella and Diamond were parties to the sale order hearing since that hearing involved Snitzer's objections to the Debtor's motion to approve sale, a proceeding where Kinsella and Diamond were not named parties. In any event, Kinsella and Diamond are in privity with the Debtors as they are the Debtors' current managers.

22

Snitzer's contention that this objection suggested an alternative to the sale seems likely. The language from the applicable language from the objection suggests this. Further, Snitzer alleges that the undercapitalization that occurred in 2005 and 2006 concerns issues different from those raised in the sale objection. The language in the objection to the sale does not involve capitalization relating to those years but to a different period of time, from March 5, 2007 to when the objection was before the Court in December 2007. However, Snitzer is not seeking to disturb the sale order but is seeking a different remedy, equitable subordination. There is no attack on the sale order. Since the third-party complaint is not based on the same core of operative facts which give rise to a remedy, there is no identity of causes of action. Snitzer did not seek to enforce the obligation in December at the sale hearing; therefore, his effort to rely on it in the third-party complaint is fresh, it is not an effort to relitigate. Snitzer should not have been required to seek equitable subordination in December because equitable subordination must proceed via an adversary proceeding, as required under Fed.R.Bankr.P. 3007(b) and 7001(8), making it impractical to delay a sale until trial of an adversary proceeding which takes longer to resolve because it entails discovery and motion practice. The Debtors' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) Snitzer's third-party complaint due to the undercapitalization claim as barred by *res judicata* is denied.

Kinsella and Diamond also urge that Snitzer's undercapitalization allegations are barred by collateral estoppel. Collateral estoppel bars litigation of an issue of law or fact where the issue was actually litigated and decided in a prior action. *La Preferida*, 914 F.2d at 905 n.7. Four elements must be met for collateral estoppel to apply: "1) the issue sought to be precluded must be the same as that invoked in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel

23

is invoked must be fully represented in the prior action." *Id.* at 906.

In this case, the test cannot be met for the same reasons the applicability of *res judicata* was rejected. The issues in the objection and the third-party complaint regarding undercapitalization do not cover the same period of time. The second requirement that the issue must have been actually litigated cannot be satisfied herein either. The capitalization issue was not litigated; it was asserted in a summary fashion but not actually plead and proven, which should be the standard as to whether an issue has been previously litigated. Further, the third element is not met either. Granting the sale motion only required a determination that "a good, sufficient, and sound business purpose and justification and compelling circumstances" existed in order to approve the sale. (Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed.R.Bankr.P. 6004 and 6006, (A) Approving Purchase and Sale Agreement, (B) Authorizing Sale of Real Property Free and Clear of Liens, Claims, Encumbrances, and Interests, and (C) Granting Related Relief, attached as Ex. C to Third-Party Defendants Kinsella and Diamond's Motion to Dismiss Snitzer's Third-Party Complaint, ¶ I, pg. 4). Deciding and specifically ruling on the capitalization issue was not necessary to make this determination. The Court's order merely overruled the objections without determining the issue of capitalization requirements. The sale motion was granted because it was clear that the proposed sale had a valid business justification. The sale order, however, did not eliminate future consideration of the undercapitalization concerns. The equitable subordination effort and other remedies such as breach of fiduciary duty, etc. are available to address this issue. Therefore, Kinsella and Diamond's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) Snitzer's undercapitalization claims on collateral estoppel grounds is denied.

### D. *Federal Rule of Bankruptcy Procedure 7014*

Kinsella and Diamond additionally move to dismiss Snitzer's third-party complaint arguing that it is procedurally improper. They urge that a claim for equitable subordination cannot be filed as a third-party claim under Fed.R.Bankr.P. 7014(a).

Kinsella and Diamond also argue that because Snitzer does not allege that they are liable to him for all or a part of the claim against them, that he can not use Fed.R.Civ.P. 14 to combine all controversies having a common relationship into one action. Because there are no allegations that Kinsella and Diamond are liable to Snitzer or SFLLC for all or part of a claim against them, the third-party complaint fails for this reason too.

Fed.R.Bankr.P. 7001(8) requires that claims for equitable subordination be pursued via an adversary proceeding. *See* Fed.R.Bank.P. 7001 ("The following are adversary proceedings:... (8) a proceeding to subordinate any allowed claim or interest, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for subordination[.]"); *see also In re Protarga, Inc.*, 2004 WL 1906145 at *3 (Bankr. D. Del. 2004) ("Claims for equitable subordination must be brought as a separate adversary proceeding pursuant to Rule 7001(8) of the Federal Rules of Bankruptcy Procedure.").

Snitzer concedes that his third-party complaint is improper under Rule 7014, but that the improper filing is a technicality. Although a technicality, it is improper under the Federal Rules of Bankruptcy Procedure and must be dismissed. However, this does not preclude Snitzer from filing a complaint in an adversary proceeding. Therefore, Kinsella and Diamond's motion to dismiss Snitzer's third-party complaint pursuant to Fed.R.Bankr.P. 7014 is granted without prejudice to

Snitzer bringing a separate adversary proceeding relating to these matters within thirty days.[10]

## IV. Conclusion

For the reasons set forth above, the Debtors' and Third-Party Defendants' Motions to Dismiss Third-Party Complaint (Dkt. Nos. 509 and 510) pursuant to Federal Rule of Civil Procedure 12(b)(6) (made applicable by Federal Rule of Bankruptcy Procedure 7012) are denied. Third-Party Defendants' Motion to Dismiss Third-Party Complaint (Docket No. 510) pursuant to Federal Rule of Civil Procedure 14(a) is granted without prejudice.

**Dated:** May 27, 2008                                  **Enter:**

*Jacqueline P. Cox*

**Jacqueline P. Cox**
**U.S. Bankruptcy Judge**

---

[10]The Debtors' counterclaim to the objection should have been pursued as an adversary proceeding. Fed.R.Bankr.P. 3007(b).